**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DENISE BONNER, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Case No. 3:04-cv-01229-WKW** |
| | ) | |
| **CHAMBERS COUNTY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

      This case is before the court on the defendants' motions for summary judgment and motion to strike. For the reasons set forth below, the Motion for Summary Judgment filed by Defendant Annie Alisha ("Lisa") Davidson (Doc. # 118) will be GRANTED. The Motion for Summary Judgment filed by Defendant Tommy Spradlin (Doc. # 108), by Defendant Derrick Burton (Doc. # 111), and by Defendant Bill Landrum (Doc. # 117) will be GRANTED in part and DENIED in part.

      With respect to the defendants' Motion to Strike Deposition Testimony and Reports of the Plaintiffs' Expert Witness (Doc. # 151), the motion will be DENIED in part, and the court will RESERVE ruling in part. The plaintiffs have filed a Motion to Strike Answer and/or Affirmative Defenses (Doc. # 180), which will be DENIED.

## I.  FACTS AND PROCEDURAL HISTORY

      The plaintiffs are Denise Bonner, Jami Davis, Chasity Brewer, April Mann, Melanie Lovelace,[1] Chandra Parker, and Jean Brooks. As inmates at the Chambers County Jail ("Jail"), these

---

[1]  In its June 19, 2006 Opinion and Order, the court granted the defendants' motions to dismiss Melanie Lovelace's § 1983 claim because it was filed outside of the statute of limitations. The defendants did not make the same argument regarding Ms. Lovelace's other claims, yet the parties have acted as if the order disposed of all her

female plaintiffs allege they suffered at the hands of jail officials and other inmates a series of sexual assaults, rapes, and extortions, and a conspiracy to conceal these offenses by and through the defendants.  The current defendants are Tommy Spradlin, Derrick Burton, and Lisa Davidson, individual officers[2] at the Jail; and Bill Landrum, the Jail Administrator.

The court reiterates the relevant facts contained in the parties' evidentiary submissions. Where a fact is in dispute, it is portrayed in the light most favorable to the plaintiffs.

*A.*     ***The Defendants***

**1.     Bill Landrum**

The Jail, which houses both convicted offenders and pre-trial detainees, was constructed in 1991. (Landrum Br. at 1, ¶¶ 1-2.) Bill Landrum ("Landrum") became the Jail Administrator in 1999 and took medical leave in the summer of 2005.  (Landrum Dep. 31:13-32:6) Accordingly, Landrum was the Jail Administrator at all relevant times.  (Landrum Br. at 1, ¶ 3.)  As Jail Administrator, Landrum was in charge of daily operations of the Jail.  (Landrum Dep.  28:7-12.)

**2.     Lisa Davidson**

Lisa Davidson ("Davidson") began working as a jailer in 1999, and in September 2002, Landrum  promoted her to Sergeant (or shift supervisor).  (Davidson Dep. 17:20-18:16.)  At all relevant times, Davidson was an officer at the Jail employed as a shift supervisor.  (Landrum Br. at

---

claims.  The court notes that the two year limitation period also applies to Ms. Lovelace's § 1985 claim, *see Trawinski v. United Tech.*, 313 F.3d 1295, 1298-99 (11th Cir. 2002), and state law claims.  *See* Ala. Code § 6-2-38(l) (1975); *Continental Cas. Ins. Co. v. McDonald*, 567 So. 2d 1208, 1215 (Ala. 1990) (outrage); *Shufford v. Integon Indem. Corp.*, 73 F. Supp. 2d 1293, 1300-01 (M.D.Ala. 1999) (invasion of privacy); *Booker v. United American Ins. Co.*, 700 So. 2d 1333, 1339 (Ala. 1997) (negligence-type claims).  Her claim under § 1986 is subject to the statute's one year limitation period.  42 U.S.C. § 1986.  Accordingly, all of Ms. Lovelace's claims will be dismissed with prejudice.

[2]  The court assumes that the "officers" referred to in the complaint are employees at the Jail.  In this memorandum, the court uses "officer" and "guard" interchangeably.

1, ¶ 3.)  Davidson is one of four sergeants at the Jail, all of whom have supervisory authority over approximately twenty officers.  (Davidson Dep. 21:11-22:9.)  Generally, five or six officers, including supervisors, work during a shift.  (*Id*. 22:10-23:5.)  Davidson was served with the original complaint in this action in January 2005.  (*Id*. 26:11-27:3.)  She testified that after she was served she did not talk to anyone at the jail, including Landrum, about the lawsuit and did not conduct an investigation into the complaint's allegations.  (*Id*. 29:4-31:4.)

### 3.    Derrick Burton

Derrick Burton ("Burton") worked as an officer of the Jail from June 29, 2004, until his employment was terminated on June  9, 2005.  (Landrum Br. at 2, ¶ 4.)  Burton testified that he did not receive training as to sexual relations between guards and inmates or between inmates and inmates.  (Burton Dep. 32:20-33:3.)  As early as August 2004, Landrum received inmate complaints about Burton.  On August 19, 2004, inmate Mario Bell informed Landrum by letter that Burton was bringing tobacco into the Jail.  (Pls.' Ex. QQ, Letter to Landrum re: Burton and Contraband.)  Landrum did not discipline Burton for bringing contraband into the Jail.  Burton received a written reprimand on January 14, 2005, for not answering inmates' calls via the intercom.  (Pls.' Ex. RR, Burton Discipline.)  After learning that he was named as a defendant in the original complaint, Burton did not discuss the lawsuit with Landrum.  (Burton Dep. 60:10-62:17.)  In May 2005, Burton was arrested, and he subsequently pleaded guilty to three counts of custodial sexual misconduct, which were charges arising out of sexual intercourse between Burton and female inmates in the Jail, none of whom are parties to this lawsuit.  (Pls.' Ex. TT, Burton Court Docs.)

4.   **Tommy Spradlin**

Tommy Spradlin ("Spradlin") is and has been an officer at the Jail since July 1999. (Landrum Br. at 2, ¶ 5.)  During the relevant time period, Spradlin worked "yard call," *i.e.*, he took inmates to the yard and performed other inmate transports.  (Spradlin Dep. 67:8-15.)  Spradlin testified that he did not receive training as to sexual activity between inmates, other than "don't handle females [because] we got female officers" and "don't mix females and males together."  (*Id.* 24:1-19.)  However, Spradlin also testified that "[Landrum] just let us know that if we were caught doing anything [related to sexual activity], that we would either lose our job or possibly go to jail." (*Id.* 31:3-18.)  Spradlin was reprimanded by Landrum in 2002 for writing a sexually explicit note to a female inmate.  (*Id.* 64:8-67:5.)  On the note, date stamped January 29, 2002, Landrum summarized the discussion he had with Spradlin about the incident and placed the note in Spadlin's file.  (Pls.' Ex.  WW, Spradlin Note to Inmate.)

B.   *The Plaintiffs*

The plaintiffs are convicted offenders who were incarcerated at the Jail at all relevant times.

1.   **Melanie Lovelace**

Melanie Lovelace, who is no longer a plaintiff, was incarcerated from March 11, 2002, to September 5, 2002. (Landrum Br. at 3, ¶ 12.)  In May 2002, Ms. Lovelace wrote a letter,  which was intended for her attorney, about her concerns about the drugs and sexual activity,  between inmates and between guards and inmates, within the Jail.  (Pls.' Ex. C, Lovelace Letter.)  In addition to allegations of widespread drug abuse by officers, she specifically wrote that Linda Gore ("Gore"), an officer at the jail, was having sex with a trustee inmate and giving him drugs and tobacco and that Davidson was using drugs.  (Lovelace Dep. 61:8-15; 63:1-4.)

4

There is no consensus on how the letter managed to get from Ms. Lovelace's cell to Landrum's hands.  (*Id*. at 59:60:20; 128:4-16; Davidson Dep. 50:16-51:12.)  After obtaining possession of the letter, Landrum met with Ms. Lovelace in his office for approximately thirty minutes. (Davidson Dep. 51:5-53:21.)  Ms. Lovelace testified that Landrum told her that "You thought you was going to send out some mail, ha, ha, I got that letter, and ain't nothing going to be done about it." (Lovelace Dep. 62:17-21.)  Davidson testified that Landrum immediately determined the allegations were false without conducting an investigation.  (Davidson Dep. 51:16-54:18.)  Landrum wrote at the end of the letter: "Talked to inmate about situation, she advised that it [was] just what she had heard[.]  Denied all[.] [S]he just writing down what she heard[.] [N]o evidence[.] [N]ot seen by her[.]"  (Pls.' Ex. C, Lovelace Letter.)

Approximately two weeks after her meeting with Landrum, on June 13, 2002, Ms. Lovelace was attacked inside her cell by a group of male trusties.  A trusty named Sly grabbed her and said, "I'm going to teach you, bitch, that you'll never open your mouth again about an officer or an inmate in here." (Lovelace Dep. 141:7-144:1.)  While a guard turned up the music,[3] Ms. Lovelace stated that he took off her clothes and "went to putting his hands all over me and went to try to put his hand up in me." (*Id*. 143:1-145:1.)  Ms. Lovelace also stated that Linda Gore paid a female inmate to "jump" her. (*Id*. 135:11-18.)  On June 16, 2002, the inmate and Ms. Lovelace fought while three guards, including Davidson, watched.  (*Id*. 135:19-139:16.)  Davidson sprayed Ms. Lovelace with mace. (*Id*. 138:5-6; 165:3-9.)

---

[3] Ms. Brewer was housed in a cell above where Ms. Lovelace was attacked.  Ms. Brewer stated Lisa Davidson "was the one playing the music on the intercom."  (Brewer Dep. 104:7-107:19.)

Ms. Lovelace reported the incidents to Sergeant Postell the next day.  In his declaration, Landrum asserts that "[n]o report was ever made to me by Sergeant Postell or any other staff member about a complaint from Melanie Lovelace."  (Defs.' Ex. I, Landrum Aff. ¶ 4.)  However, Jeff Blackstone ("Blackstone"), an investigator for the sheriff's department, testified that, ***on Landrum's request***, he investigated Ms. Lovelace's rape allegations. (Blackstone Dep. 18:9-13.)  Blackstone testified that "Bill told me about somebody had said that [Ms. Lovelace] was screaming rape or something to that effect."  (*Id*. 20:22-21:1.)  Blackstone further stated that he spoke only once with Ms. Lovelace, who denied that she had been raped.  (*Id*. 18-20.)  He did not investigate Ms. Lovelace's allegations of Gore's sexual activities.  (*Id*. 20:19-22.)

Only after another inmate made allegations against Gore did Landrum request an investigation by the sheriff's office.  (Landrum Aff. ¶ 3.)  The defendants do not identify the inmate who made the allegations nor the investigator who conducted the investigation.  Landrum reviewed surveillance tapes.  (*Id*.)  Linda Gore was placed on administrative leave and, on June 25, 2002, was "fired for engaging in sexual improprieties with a male inmate."  (*Id*.)

## 2.   **Denise Bonner**

Ms. Bonner, formerly known as Denise Lyons, was incarcerated at the Jail from January 7, 2003, to December 23, 2003.  (Landrum Br. at 2, ¶ 6.)

During the evening of December 16 or 17, 2003, Ms. Bonner was raped in the Isolation Block ("I-Block") by George "Nino" Day, another inmate housed in I-block whom she believed was charged with capital murder.  (Bonner Dep. 45:22-54:10.)  Ms. Bonner "heard the door click" and

asked Nino how he got into her cell because she knew that he did not have a key.[4]  (*Id*. 48:16-49:1.)

Nino pulled her "shirt up, and then he started doing it" for about "ten minutes."  (*Id*. 49:12-13;

53:22-54:3.)  She told him "don't" and told him to " stop."  (*Id*. 51:11.)

Afterward, Ms. Bonner submitted four requests to Nurse Bolt to "get checked" for disease

and pregnancy, but her requests were ignored.[5]  (*Id*. 54:4-57:8.)  The day after the rape, on

December 18, 2007, she told her attorney about the rape.  (*Id*. 59:9-13.)  Her attorney immediately

informed Landrum and others in the sheriff's department that Bonner had been raped.  (Blackstone

Dep. 22:16-25:20; Landrum Dep. 57:7-18.[6])  The day after she spoke with her attorney, she told two

sheriff's department detectives, Blackstone and another detective believed to be Tommy Sims

("Sims"), about the rape and she signed two statements they had *already* been prepared.  (*Id*. 61:11-

18; 69:22-70:1.)  One statement is typed by Landrum and signed by both Landrum and Ms. Bonner.

(Pls.' Ex. R, 12/18/03 Bonner/Day Statement.)  It purports to be a transcript of a conversation

between Landrum and Bonner, in which Bonner states, "I did not say I was raped[.] I didn't tell him

that." (*Id*.)  The second is a witness statement written by someone other than Ms. Bonner with what

may be Ms. Bonner's signature.  (Pls.' Ex. S, 12/18/03 Bonner Witness Statement.)  It includes

statements such as "I never told my attorney I got raped; Nino wanted sex and I did too." (*Id*.)  Ms.

---

[4]  When asked how a male inmate could enter a female inmate's cell, Spradlin stated, "Either the doors wasn't locked like it was supposed to be, or an officer had to push a button."  (Spradlin Dep. 55:7-12.)

[5]  Nurse Bolt testified that on December 16, 2003, she did see Ms. Bonner, who told her, "I had sex with George Day."  (Bolt Dep. 39:22-40:8; 52:20-22.)

[6]  Landrum asserts that Ms. Bonner's attorney did not speak to him until five days after the rape occurred. Landrum claims that Ms. Bonner told Landrum that she did not tell her attorney that she was "raped but that she and Nino had consensual sex in her cell after they both had rigged their cell doors not to lock.  Ms. Bonner denies ever speaking to Landrum about the rape.  (Bonner Dep.84:22-85:13.)  Landrum further claims that this story was corroborated by Nino.  (Landrum Dep. 62:13-64:23.)  Blackstone claims that when he interviewed Ms. Bonner, she told him that she had not been raped, that she had consensual sex with Nino in Nino's cell, and that she liked it. (Blackstone Dep 27:10-28:22.)

Bonner "can't read real good;" she testified that "I did not read none of this.  He just told me to sign and put my initials, and I just signed and put my initials to it."  (Bonner Dep. 74:17-75:9.)  There is no dispute, however, that inmate-on-inmate sex occurred on this occasion.

On December 19, 2007, Ms. Bonner wrote a note to Landrum requesting that she be moved out of I-Block because she feared that Nino would retaliate against her for her reporting the rape.  (Pls.' Ex. YY, 12/19/03 Bonner Handwritten Note to Landrum; Bonner Dep. 85:14-87:11.)  She did not receive anything back from Landrum, nor did she meet with him about the incident.  (Bonner Dep. 84:22-85:13; 89:3-12.)

Throughout her incarceration Ms. Bonner made many requests for early release, all of which were denied. (Pls.' Ex. M, Bonner Inmate Request Forms & Notes.)  Despite her firm release date of January 2, 2004, Bonner was released shortly after the alleged rape.  Blackstone represented that, even though he claimed that Ms. Bonner allegedly denied any rape allegations, he believed that Ms. Bonner should be let out early.  (Blackstone Dep. 34:7-20 .)  Sims had the circuit court judge issue an order to release her--which was not normal practice and which Blackstone had not done previously.  (*Id*. 35:18-23; 46:1- 10.)  Ms. Bonner signed a third statement, a "release," dated December 23, 2003.  (Pls.' Ex. U, Bonner Release.)  Ms. Bonner testified, "We talked, and [the detectives] told me to sign it so I can go on and get out, out of jail, to go on and sign it.  The quicker we get this signed, the quicker I can come on and get out of jail."  (Bonner Dep. 82:8-20.)  Ms. Bonner believed that the release was a document that must be signed prior to her release from the jail.  She testified: "[Blackstone] told me I could get out as soon as I signed this paper.  This was a release paper, release, to be released."  (*Id*. 91:8-10.)

In fact, the release was a release from liability:

> [I]n consideration of my early release from the Chambers County Detention Center
> . . . do hereby voluntarily, freely, and of my own volition release, acquit, and
> discharge the said Sheriff Sid Lockhart, Chambers County, Alabama, and their
> officers . . . from all claims and demands . . . on account of, or in any way growing
> out of any and all damages and/or personal injuries I or anyone else may have
> sustained as a result of my incarceration in the Chambers County Detention Center.

(Pls.' Ex. U, Bonner Release.) Upon Blackstone's request, Chambers County Attorney Skip McCoy

prepared the release, but he advised Blackstone that Ms. Bonner would need to speak with her

attorney before signing the document. (McCoy Dep. 7:20-8:10; 13:20-14:8.) Blackstone told Skip

McCoy that he had contacted Ms. Bonner's attorney, but he had not nor had he allowed Ms. Bonner

the opportunity to speak with her attorney. (*Id*. 14:9-13; Blackstone Dep. 42:10-22.) The release

also contains signatures of witnesses, Blackstone and Davidson. (Pls.' Ex. U, Bonner Release.)

### 3.    <u>Jami Davis</u>

Ms. Davis was incarcerated at the Jail from June 21, 2004, to October 28, 2004. (Landrum

Br. at 2, ¶ 7.) In exchange for drugs, money, and gifts, Ms. Davis was coerced into engaging in

sexual acts  with Spradlin, Burton, and a trusty, Antonio ("Yo-Yo") Cooper.

During August and September, while escorting the female inmates into the yard, Spradlin

began making sexual comments to Ms. Davis. (Davis Dep. 83:23-84:23.) He also wrote her two

notes. (*Id*. 77:2-14.) In one conversation, while his hand was on her rear end, Spradlin asked Ms.

Davis if she needed anything. (*Id*. 87:17-89:12.) She responded that she needed money, and he

arranged for her to receive money several times. (*Id*. 87:17-88:22.) Spradlin expected to touch Ms.

Davis in return for sending her money. (*Id*. 88:23-89:21.) He also gave her toiletries, cigarettes, and

small gifts. (*Id*. 91:17-94:21.) After the touching began, Spradlin touched Ms. Davis *daily* until she

was released. (*Id*. 94:22-95:17.) His touching became "more extreme, you know, more physical."

(*Id.* 95:21-22.)  Ms. Davis testified that Spradlin touched her under her clothes "[b]etween my legs, my rear end, breasts, put his tongue in my mouth once," and he made her touch his penis over his clothes on a few occasions. (*Id.* 95:23-97:15.)

At times she told him to stop, but "[h]e laughed it off. Sometimes he stopped, sometimes he didn't." (*Id.* 90:3-7.)  Ms. Davis never reported the incidents because "[w]hat good would it have done?  And I was getting what I wanted out of it." (*Id.* 90:8- 22.)  She was told that Spradlin was infatuated with her, so she flirted with him because he brought her things, which made her "time a lot easier." (*Id.* 101:6-11; 104:9-19.)

Several inmates witnessed Spradlin's assaults on Ms. Davis.  Ms. Brewer testified that she saw Spradlin touch Ms. Davis: "I've seen him try to kiss her, he grabbed her behind, between her legs, her breasts.  I've actually seen him push her behind the door and try to keep her from going into H block." (Brewer Dep. 186:20-187:9.)  Spradlin engaged in similar behavior with Ms. Brewer's former cellmate, Candida Ashley.  (*Id.* 180:6-182:22.)  Ms. Mann also saw Spradlin grab Ms. Davis "[o]n the butt, her breasts" several times when he escorted the inmates outside.  (Mann Dep. 86:19-87:7.)  Spradlin denies having any physical contact with Ms. Davis.  (Spradlin Dep. 43:10-12.)

Burton's physical contact with Ms. Davis began in July.  (Davis Dep. 111:5-6.)  Burton suggested that he bring Ms. Davis cocaine and candy in exchange for oral sex.  (*Id.* 113:23-114:23.)  Burton came into Ms. Davis's cell on two or three occasions when she was alone, and she gave him oral sex.  (*Id.* 112:1-113:19.)  Burton also touched her through the tray slot. (*Id.* 116:3-9.)  She could have moved, but "[i]t was easier to say yes and get what I wanted." (*Id.* 116:10-16.)  On another occasion, Ms. Davis testified that Burton "popped the lock from the pod," and another guard, Cindy Carraire, opened the door to allow Yo-Yo into Ms. Davis's cell where she and Yo-Yo engaged in

oral sex and intercourse.  (*Id*. 117:12-120:22.)  In September 2004, Ms. Parker witnessed Burton enter the women's cell block with inmate Yo-Yo Cooper.  (Parker Dep. 107:14-108:22.)  As Burton watched from the doorway and Ms. Parker watched from her cell, Yo-Yo grabbed Ms. Davis, kissed her, and touched her.  (*Id*.)  Ms. Davis resisted and got out of his grasp.  (*Id*. 284:18-285:20.)

### 4.    <u>Chasity Brewer</u>

Ms. Brewer was incarcerated at the Jail from June 29, 2004, to September 14, 2004. (Landrum Br. at 2, ¶ 8.)  During her term of incarceration, she was sexually assaulted by Officer Danny Tucker ("Tucker").  (Brewer Dep. 112:20-115:19.)  Tucker was originally named a defendant in this suit.  However, the plaintiffs were unable to perfect service upon him, and he was later dismissed without prejudice.  (Doc. # 91.)  Ms. Brewer alleges that, on five to ten occasions, Tucker coerced her into performing oral sex on him in exchange for his silence regarding Ms. Brewer's sexual relationship with her boyfriend, Anthony Barker, another trusty/inmate.  (Brewer Dep. 128:11-23.)  Ms. Brewer alleges that Tucker's sexual assaults on her occurred in the laundry room, which is located across from Bill Landrum's office, and concludes that Landrum's secretary "could have easily seen who was going in and out of the laundry room."  (Pls.' Resp. to Landrum at 17.)

During a previous incarceration she met Tony Brewer, an inmate trusty, and later married him.  (Brewer Dep. 67:1-11.)  Through this relationship, Ms. Brewer became aware of Tony Brewer receiving special treatment from Landrum in violation of jail policy.  The special treatment involved granting Tony Brewer special weekend passes, (*id*. 70:1-21); allowing him to leave the jail without a pass, (*id*. 71:13-75:10); bringing him to Ms. Brewer's home for visits, (*id*. 75:11-79:8); and paying him money for side jobs performed for Landrum, Sheriff Lockhart, a probate judge, and the circuit clerk.  (*Id*. 79:3-80:3; 86:4-87:17.)

11

5.      **April Kelly Mann**

Ms. Mann was incarcerated at the Jail from August 17, 2004, to January 12, 2005. (Landrum Br. at 2, ¶ 9.) On September 20, 2004, while in the custody of the Jail, Ms. Mann was fondled by male inmates as they awaited transport from the Chambers County Courthouse back to the Jail.[7] (Mann Dep. 40:12-51:11.) After their respective court appearances, both male and female inmates were placed, unhandcuffed and unsupervised, in a small hallway for a period of fifteen to thirty minutes. (*Id*. 45:22-48:11.) A male inmate, Chartina Porter, touched Ms. Mann with his hands and body: "Chartina Porter was just rubbing all over me, and I was trying to get away from him, running around from the other guys, and the other guys were pushing me back into him." (*Id*. 48:18-22; 49:12-21.) She did not report this incident to the officers because she "figured it would cause me more problems." (*Id*. 50:21-51:3.)

One night after lockdown in early January 2005, Burton propositioned Ms. Mann and her cellmates over the intercom. (*Id*. 62:14-63:1.) In exchange for a "striptease" or "freak show," he "would bring them whatever they wanted in the next couple of days." (*Id*. 63:3-18.) Ms. Mann declined Burton's invitation, but her cellmates went to the bottom floor after Burton unlocked their cell door, *i.e*., "popped [the] gate." (*Id*.) They "gave him a striptease" as he watched through the tray slot. (*Id*.; 68:15-23.) Ms. Mann testified that Burton had a similar encounter with Jean Brooks that night and with another inmate on other occasions. (*Id*. 70:23-77:15.)

---

[7] The parties debate whether the unwanted touching experienced by Ms. Mann is accurately described as "sexual assault." When questioned at one point, Ms. Mann denied being "sexually assaulted" because she believed sexual assault necessarily implied sex or actual penetration. (Pls.' Ex. Z, Mann Dep. 98:22-99:16; 109:11-22.) The label ascribed to the conduct is irrelevant for summary judgment purposes.

6.    **Chandra Parker and Jean Brooks**

Ms. Parker was incarcerated at the Jail from June 27, 2004, to March 1, 2005.  (Landrum Br. at 2, ¶ 10.)  In August 2004, Ms. Parker documented in her diary several incidents of sexual and other misconduct in the Jail known to officers: male and female inmates kissing, (Parker Dep. 213:8-23); officers passing notes and gifts between male and female inmates, (*id.* 248:23-251:18); and guards' facilitation of male inmates entering the female cell block.  (*Id.* 241:3-12; Pls.' Ex. BB, Parker Diary Notes.)

In September 2004, Ms. Parker witnessed an incident between inmate Yo-Yo and Ms. Davis. While accompanied by Burton, Yo-Yo entered the female cell block to gather laundry and then he grabbed, kissed, and touched Ms. Davis, who tried to push him away.  (Parker Dep. 107:14-109:10.) Burton stood in the doorway and did not try to stop Yo-Yo.  (*Id.*)  Concerned for her safety, Ms. Parker completed a grievance form about this incident, addressed it to the attention of Landrum, and gave it to an officer.  (*Id.* 107:14-110:18.)  The next business day Landrum directed one of the officers to retrieve Ms. Parker to discuss her grievance.  (*Id.* 109:13-111:5.)  After she told Landrum what she had seen, he promised her that he would investigate the incident and get back to her; however, Ms. Parker never heard back from Landrum.  (*Id.*)

Ms. Parker's cellmate, Ms. Brooks, was incarcerated at the Jail from November 20, 2004, to March 7, 2005.  (Landrum Br. at 3, ¶ 11.)  During her incarceration, Ms. Brooks and other female inmates complained about inmate trusty Randy Williams's behavior, *i.e.*, his exposure of his genitals when he delivered food trays to the female inmates.  (Brooks Dep. 122:2-124:3.)  Ms. Brooks and the female inmates complained to Officers Moore and Rowe and sent a request form, documenting Randy Williams's behavior and signed by several female inmates, to Davidson.  (*Id.* 124:4-18.)

13

Davidson  spoke to the women about it, but Randy Williams continued to expose himself to the women.  (*Id*. 124:19-125:4.)

After lockdown on January 11, 2005, which was *after this action was filed and served on the defendants*, Burton called via intercom into another female  inmate's cell and offered her cigarettes and crack cocaine "if she stripped for him" and inmate trusty Randy Williams.  (Parker Dep. 118:19-119:14.)  If she refused, Burton "told her that he was going to get her written up, and he was going to take different things from her."  (*Id*.)  Burton unlocked the cell door, and the inmate walked down the stairs in the female cell block to a place where she could be seen by Burton and Williams, who were watching through the tray slot.  (*Id*. 119:16-122:6; Pls.' Ex. CC, Parker Aff. ¶ 7; Pls." Ex. GG, Brooks Aff. ¶ 4.)  She took off her clothes and masturbated; Burton and Williams "were self-stimulating themselves while she was doing that."  (Parker Dep. 121:4-8; Brooks Aff. ¶ 4.)  Burton then called another female inmate to do the same thing, who also complied with his request.  (Parker Aff. ¶ 7; Brooks Aff. ¶ 4.)  Ms. Parker heard Burton say, "Thanks for the show and I know you are not going to tell anyone."  (Parker Aff. ¶ 7; Brooks Aff. ¶ 4.)  Either Burton or Williams then slid a pack of cigarettes under the door for those inmates.  (Parker Dep. 121:12-122:6.)

Ms. Parker and Ms. Brooks, both of whom observed the incident, told Burton via the intercom that they had seen him.  He opened their cell door and told them to come out and perform the same act, but they refused.  (Pls.' Ex. BB, Parker Diary Notes.)  Ms. Parker explained why she did not report this to another officer that night:

> Because [Burton] would have known that I was the one that called.  And you don't want to upset officers, and you know, and you don't want to make them mad because they have control over you, you know, when – and  women, I mean, we did things that we weren't proud of because we felt threatened, because they would – they would take our store commissary or because they would leave us locked down a

14

week or because they will take the TV or outside yard privileges, so no, I didn't [report the incident].

(Parker Dep. 122:13-123:6.)  Williams later approached Ms. Parker and stated that Burton knew that she and Ms. Brooks had seen him and that he was going to force them to do the same.  (Parker Aff. ¶ 8; Brooks Aff. ¶ 5.)  If they refused, Burton would take away their privileges and make life in the jail very difficult.  (Parker Aff. ¶ 8; Brooks Aff. ¶ 5; Parker Dep. 148:11-150:1.)  Ms. Brooks told Williams that she wanted Newport cigarettes.  (Parker Dep. 150:3-8.)

The next day, January 12, 2005, Williams told Ms. Brooks that after lockdown that night, Burton would "pop" the door, signaling her to come downstairs, and that she should make sure that Ms. Parker was asleep.  (*Id.* 150:9-18; Brooks Dep. 131:13-18.)  After lockdown the door to Ms. Parker and Ms. Brooks's cell was unlocked, and Ms. Brooks went to a place on the stairs where Burton and Williams could see her through the tray slot.  (Parker Dep. 150:19-151:3; Brooks Dep. 131:13-18.)  Ms. Brooks took off her clothes and masturbated while Burton and Williams did the same.  (Parker Dep. 151:3-14; Brooks Dep. 131:19-132:5.)  Burton and Williams slid cigarettes under the door to Ms. Brooks.  (Parker Dep. 151:15-152:3; Brooks Aff. ¶ 6.)  Williams then spoke to Ms. Parker on behalf of Burton.  (Parker Dep. 152:7-13.)  According to Williams, Burton said he knew that Ms. Parker had not been sleeping, that she had been watching, and asked, "[H]ow much would it take for [Ms. Parker] to keep [her] mouth shut?"  (*Id.*)  Ms. Parker promised silence in exchange for Burton depositing twenty dollars into her commissary account.  (*Id.* 152:14-153:9.)

On January 25, 2005, plaintiffs' counsel's representative, Daniel Tate, interviewed Ms. Parker at the Jail.  (Parker Aff. ¶ 11; Tate Aff. ¶¶ 3-4.)  Despite having previously arranged for the interviews with Ms. Parker and other inmates, Landrum terminated the interview, stating that "no

15

inmates may be intervew[ed] about this case unless the person that is doing the interviewing is cleared by his legal department." (Tate. Aff. ¶¶ 5.) Later that night, Ms. Parker was awakened by an angry Burton standing in her cell. (Parker Dep. 172:9-18.) Burton told her that he knew she talked with an investigator earlier that day, that "there is no need to tell anyone about what happened because no one is going to believe you," and that she had not kept up with her end of the bargain for the twenty dollars he put in her commissary account. (*Id.* 172:19-173-13; Parker Aff. ¶¶ 12-13.) Burton said, "I know how to keep your mouth shut." Burton unzipped his pants, took out his penis, and told Ms. Parker that if she did not "suck his dick," he was going to make life very hard for her in the jail. (Parker Aff. ¶ 13; Parker Dep. 173:7-174:8.) Burton then forced Ms. Parker to perform oral sex on him. (Parker Aff. ¶ 13; Parker Dep. 175:16-176:14.) Burton also forced Ms. Brooks, to perform oral sex on him, stating, "I'm not going to leave you out." (Parker Aff. ¶ 14; Parker Dep. 175:18-176:21; Brooks Aff.¶ 10.) The women, extremely upset and frightened for their lives, stayed up and cried about the incident for hours. (Parker Aff. ¶ 15; Brooks Aff. ¶ 10.) Burton taunted and threatened them the following week. (Brooks Dep. 142:8-143:13.)

## C.    *Procedural History*

Plaintiffs instituted this action on December 22, 2004, and later amended their complaint. After resolution of various motions to dismiss in a previous order (Doc. # 96), the following claims remain against the four defendants: (1) all plaintiffs' § 1983 claims for deprivations of rights under the Eighth and Fourteenth Amendments, § 1985 claims for conspiracy to interfere with civil rights, and § 1986 claims for failure to prevent the interference with civil rights against Landrum;  (2) Bonner's, Parker's, and Brooks's § 1983, § 1985, and § 1986 claims against Davidson; (3) Parker's, Brooks's, and Davis's § 1983, § 1985, and § 1986 claims and state law claims of privacy, assault and

battery, and outrage against Burton; and (4) Davis's § 1983 claim and state law claims of privacy, assault and battery, and outrage against Spradlin.  Plaintiffs seek declaratory and injunctive relief, compensatory and punitive damages, and costs and fees.

## II.  JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).  The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations in support of both.

## III.  STANDARD OF REVIEW

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id*. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id*. at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"

17

*Id.* at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that

there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp*., 475 U.S. 574, 586 (1986).  On the other hand, a court ruling on a motion for summary

judgment must believe the evidence of the non-movant and must draw all justifiable inferences from

the evidence in the non-moving party's favor.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255

(1986).  After the nonmoving party has responded to the motion for summary judgment, the court

must grant summary judgment if there is no genuine issue of material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

## IV.  DISCUSSION

Additional factual allegations will be referenced in the discussion where appropriate.

## <u>SECTION 1983</u>

The plaintiffs bring claims under § 1983, which provides a cause of action against any person

acting under the color of state law for intentional deprivations of any right secured by the

Constitution.[8]  The plaintiffs' claims arise from the alleged deprivations of their right to bodily

privacy and to equal protection secured by the Fourteenth Amendment and their right to be free from

cruel and unusual punishment secured by the Eighth Amendment.  The court will structure its

analyses of the claims on a plaintiff-by-plaintiff basis, but before turning to  that discussion, the

court examines the legal standards at issue in this case.

### A.    *Legal Standards*

Although not entirely clear from the pleadings and the summary judgment briefs, the  court

concludes that plaintiffs' claims against Spradlin and Burton are for their direct constitutional

---

[8]  The parties do not dispute that the defendants were acting under the color of state law.

18

violations of the (1) Eighth Amendment right to be free from inmate violence ("failure to protect"); (2) Eighth Amendment right to be free from sexual abuse by guards; (3) Fourteenth Amendment right to bodily privacy; and (4) Fourteenth Amendment right to equal protection.[9] The plaintiffs do not allege that Davidson and Landrum actually committed sexual abuse; rather, the plaintiffs allege that Davidson and Landrum (1) failed to protect them from sexual abuse by guards and inmates in violation of the Eighth Amendment; and (2) failed to protect them from an excessive risk of harm that was created by policies Landrum and Davidson implemented or by policies Landrum and Davidson failed to implement in violation of the Eighth Amendment.

## 1. Eighth Amendment Failure to Protect

### a. Deliberate Indifference

In its prohibition of cruel and unusual punishments, the Eighth Amendment imposes on prison officials the duty to provide humane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "'[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.'" *Id.* at 833 (quoting *Cortes v. Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)); *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

When officials are accused of failing to protect prisoners from harm, the claimant must show that the deprivation is, objectively, sufficiently serious; the prison official has a sufficiently culpable

---

[9] It appears from the Second Amended Complaint that the plaintiffs also invoked their right to substantive due process pursuant to the Fourteenth Amendment. The claims are appropriately analyzed under the Eighth Amendment; therefore, the substantive due process claims will be dismissed. *See United States v. Lanier*, 520 U.S. 259, 272 (1997).

state of mind, *i.e.*, he or she acted with deliberate indifference, *id.* at 834, and; the constitutional

violation caused the claimant's injuries. *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1028 (11th

Cir. 2001).

>   The Supreme Court expounded on the concept of deliberate indifference:

>   We hold . . . that a prison official cannot be found liable under the Eighth
>   Amendment for denying an inmate humane conditions of confinement unless the
>   official knows of and disregards an excessive risk to inmate health or safety; the
>   official must both be aware of facts from which the inference could be drawn that a
>   substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837.   A defendant's knowledge of a substantial risk can be proved by

circumstantial evidence, "and a factfinder may conclude that a prison official knew of a substantial

risk from the very fact that the risk was obvious." *Id.* at 842.   A trier of fact is permitted to find a

prison official had knowledge of the risk if the "plaintiff presents evidence showing that a substantial

risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison

officials in the past, and the circumstances suggest that the defendant-official being sued had been

exposed to information concerning the risk and thus must have known about it."[10]  *Id.* at 842-43

(internal quotation marks and citation omitted).   However, a finding that "a reasonable person would

have known, or that the defendant should have known" is not enough for liability to attach.  *Id.* at

843 n.8.[11]

>   While a prison official's knowledge of an excessive risk of serious harm may be inferred

from the fact that the risk is obvious, this inference is not compelled; the official has the opportunity

---

[10] In other words, to find the prison official culpable, there must be evidence that the risk *existed in fact* and that official was sufficiently exposed *to that fact*.

[11] Therefore, "must have known" reflects a sufficiently culpable mental state; "would have known" or "should have known" do not.

to show he was unaware of the risk.  *Id.* at 844.  But the prison official cannot escape liability by showing that he (1) "merely refused to verify underlying facts that he strongly suspected to be true," *id.* at 843 n.8, (2) "declined to confirm inferences of risk that he strongly suspected to exist," *id.*, or (3) "did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault," *id.* at 843.

Not only will a prison official who is aware of a substantial risk of serious harm to inmates be held liable if he disregards the risk, but also if he "react[s] to this risk in an objectively unreasonable manner."  *Marsh*, 268 F.3d at 1029 (citing *Farmer*, 511 U.S. at 844-45).  "[I]f they responded reasonably to the risk, even if the harm ultimately was not averted," prison officials will not be held liable.  *Farmer*, 511 U.S. at 844.

*Farmer* also instructs on the showing a plaintiff needs to make to survive summary judgment on a deliberate indifference claim.[12]  *Id.* at 846.  "[T]o survive  summary judgment, [the plaintiffs] must come forward with evidence from which it can be inferred that the defendant-officials were at the time [of the injury] knowingly and unreasonably disregarding an objectively unreasonable risk of harm."  *Id.*

### b.    Supervisory Liability

The plaintiffs claim that the supervisor defendants, Landrum and Davidson, were aware of the excessive risk of harm to the plaintiffs because the risk was obvious from inmate complaints and, therefore, should be held liable for the acts of their subordinates.  The parties generally agree on the familiar standard of supervisory liability.

---

[12]  This discussion in *Farmer* was in the context of a claim for injunctive relief; however, it is equally applicable to a claim for damages.

A supervisor may be liable under § 1983 in his or her individual capacity for the actions of a subordinate, but the standard is " extremely rigorous." *Braddy v. Florida Dep't of Labor & Empl. Sec.*, 133 F.3d 797, 802 (11th Cir. 1998). Supervisory officials are not liable for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability. *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1308 (11th Cir. 2006). And, in the absence of any underlying constitutional violation, liability cannot be placed on a supervisor. *See Sigman v. Town of Chapel Hill*, 161 F.3d 782, 788 (4th Cir. 1998).

Supervisory liability can exist "either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). "The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). The widespread abuse must "be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Id.* The causal connection may also be established when the facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so. *Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir. 2003) (citing *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1561 (11th Cir. 1993)).

The plaintiffs claim that Landrum and Davidson's policies were so defective that the policies themselves created an excessive risk of harm of which the defendants were aware and which they disregarded. Supervisory liability may be imposed under these circumstances. Liability may be imposed on a supervisor where a supervisor's improper custom or policy results in deliberate

indifference to constitutional rights. *Gonzalez*, 325 F.3d at 1234; *Rivas v. Freeman*, 940 F.2d 1491,

1495 (11th Cir. 1991). Under appropriate circumstances, liability may be imposed for a single

decision by policymakers or by their delegatees. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480

(1986). A policy of inadequate training or supervision may constitute a policy giving rise to liability.

*See Canton v. Harris*, 489 U.S. 378, 389 (1989) ("Only where a municipality's failure to train its

employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants

can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under

§ 1983.") Liability attaches only where such failure to train or supervise reflects a deliberate or

conscious decision by the policymaker. *Id.* at 389.

2.   **Eighth Amendment Sexual Abuse by Guards**

A prison official's severe or repetitive sexual abuse of an inmate is a violation of the Eighth

Amendment.[13] *Boxer X v. Harris*, 437 F.3d 1107, 1111 (11th Cir.), *reh'g en banc denied*, 459 F.3d

1114 (11th Cir. 2006), *cert. denied*, _ U.S. _, 127 S. Ct. 1908 (2007). "'[S]exual abuse of a prisoner

by a corrections officer has no legitimate penological purpose.'" *Id.* (quoting *Boddie v. Schneider*,

105 F.3d 857, 860-61 (2d Cir. 1997)). Because "[s]exual abuse . . . can cause severe physical and

psychological harm . . . , there can be no doubt that severe or repetitive sexual abuse of an inmate

---

[13]  The parties seem to agree that the plaintiffs' Eighth Amendment claims are to be evaluated as conditions of confinement claims as opposed to excessive force claims. Even the claims involving the sexual assault of inmates by jailers are evaluated as conditions of confinement claims. There is some support for this standard. *See Boxer X*, 437 F.3d at 1111. In *Boxer X*, the Eleventh Circuit "join[s] other circuits recognizing that severe or repetitive sexual abuse of a prisoner by a prison official can violate the Eighth Amendment." *Id.* (citing *Giron v. Corrections Corp. of Am.*, 191 F.3d 1281, 1290 (10th Cir. 1999); *Freitas v. Ault*, 109 F.3d 1335, 1338 (8th Cir. 1997); *Boddie v. Schneider*, 105 F.3d 857, 860-61 (2d Cir. 1997)). The Tenth Circuit in *Giron*, however, treated an inmate's claim of rape against a prison guard as an excessive force claim. When officials are accused of using excessive physical force, an Eighth Amendment claimant must show that officials applied the force "maliciously and sadistically for the very purpose of causing harm." *Farmer*, 511 U.S. at 835 (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)). Although it cited *Giron*, the Eleventh Circuit specifically followed *Boddie*, which evaluated prisoner sexual abuse claims as conditions of confinement claims. In light of this precedent, the court will analyze all of the plaintiffs' Eighth Amendment claims as conditions of confinement claims by utilizing the deliberate indifference standard.

by a prison officer can be 'objectively, sufficiently serious' . . . [and] the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind." *Boddie*, 105 F.3d at 861.

### 3.   **Right to Bodily Privacy**

The Eleventh Circuit recognizes a prisoner's constitutional right to bodily privacy under the liberty component of the Fourteenth Amendment. *Boxer X*, 437 F.3d at 1111; *Padgett v. Donald*, 401 F.3d 1273, 1281 (11th Cir. 2005); *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993). This right involves people's "special sense of privacy in their genitals [because] the involuntary exposure of them in the presence of people of the other sex [when not reasonably necessary] may be especially demeaning and humiliating.'" *Fortner*, 983 F.2d at 1030 (quoting *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981)).

Although the scope of this right is limited and not clearly defined, a review of the cases is instructive. The *Boxer X* Court held that "Boxer's claim is clearly within the scope of the right [to bodily privacy] established in *Fortner*." *Boxer X*, 437 F.3d at 1111. The plaintiff in *Boxer X* alleged that a female prison guard solicited him to expose his genitals and to masturbate for her viewing. Sometimes  he complied with her requests, and other times he did not.  The male plaintiffs in *Fortner* alleged that female guards acted "unprofessionally" when they "flirt, seduce, solicit, and aroused [sic] them to masturbate and otherwise exhibit their genitals for the female officers' viewing." *Fortner*, 983 F.2d at 1027.  After recognizing the right to bodily privacy, the Eleventh Circuit reversed the district court's dismissal of the male inmates' claim for injunctive relief and remanded for determination of whether the assignment policy, which allowed female guards to view male inmates nude in their living quarters, was reasonable. *Id.* at 1030.  In *Lee*, the Fourth Circuit found an unwarranted invasion of the right to privacy where male prison guards forcefully removed

24

the female inmate's undergarments after she was determined to be suicidal.  The plaintiff testified

that she had been willing "to remove her underclothing if the male guards would withdraw."  *Lee*,

641 F.2d at 1120.  The appellate court upheld the plaintiff's verdict because under the plaintiff's

version of events, "it was wholly unnecessary for the male guards to remain in the room and to

restrain the plaintiff while her underclothing was forcefully removed."  *Id.*   Therefore, from these

cases it appears that an inmate's right to bodily privacy has not been expanded beyond instances of

compelled nudity and masturbation.[14]

### 4.   <u>Equal Protection</u>

The Equal Protection Clause requires the government to treat similarly situated people alike.

*City of Cleburne, Texas v. Cleburne Living Ct.*, 473 U.S. 432, 439 (1985); *Campbell v. Rainbow*

*City, Ala.*, 434 F.3d. 1306, 1313-14 (11th Cir. 2006).   This provision protects prisoners from sex

discrimination  by jail personnel.  *See Harris v Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995); *see also*

*J.E.B. v. Alabama*, 511 U.S. 127, 130-31 (1994) ("Intentional discrimination on the basis of gender

by state actors violates the Equal Protection Clause.").   To assert a viable equal protection claim,

plaintiffs must first make a threshold showing that they were treated differently from others who

were similarly situated to them.  *City of Cleburne*, 473 U.S. at 439; *Rodriguez v. Lamer*, 60 F.3d 745,

749 (11th Cir. 1995).

Before evaluating the claims on a plaintiff-by-plaintiff basis, the court first addresses the

§ 1983 claims alleging equal protection violations as such discussion applies to all of the plaintiffs.

The plaintiffs allege that certain of the defendants discriminated against them on the basis

of gender in violation of the Equal Protection Clause by subjecting them to, and failing to protect

---

[14] *But see infra* note 26.

them from, sexual harassment and sexual assault.  The defendants are entitled to summary judgment on the equal protection claims because these claims are more properly analyzed under the Eighth Amendment.  *See Barney v. Pulsipher*, 143 F.3d 1299, 1312 n.15 (10th Cir. 1998).  In conditions of confinement cases, the Equal Protection Clause is usually invoked to remedy disparities in the correctional facilities or the correctional programming offered to male and female inmates.  *Id.*; *see, e.g., Oliver v. Scott*, 276 F.3d 736, 746-47 (5th Cir. 2002) (holding there is no violation of male inmate's equal protection rights where female inmates have privacy partitions and no opposite sex supervision during showers but male inmates do not); *Klinger v. Dep't of Corr.*, 31 F.3d 727, 732-33 (8th Cir. 1994) (finding there is no violation of female inmates' equal protection rights even though their prison programs were inferior to those of male inmates).

Even if the Equal Protection Clause were applicable to the plaintiffs' claims arising from sexual harassment and assault in the Jail, the claims would fail because the plaintiffs have not identified or produced evidence of similarly situated male inmates who have been treated differently or of discriminatory motive.  Despite the plaintiffs' assertion, such as that made by Ms. Davis, for example, that "[p]laintiffs have presented evidence that Defendant Spradlin's treatment of female inmates violated the Equal Protection clause of the Fourteenth Amendment," (Davis Resp. at 11), the court finds that the plaintiffs have not come forward with any evidence indicating that there has been a difference in treatment between the female and male *inmates* at the Jail.  There is testimony that Landrum fired Gore for "sexual improprieties with a male inmate," which arguably may be the same behavior in which Spradlin and Burton and other male guards engaged.  However, this is evidence only of the fact that male and female *guards* may have been treated differently.  Without evidence of similarly situated  comparators, the court cannot discern whether the defendants'

26

treatment of the plaintiffs was motivated by an unlawfully discriminatory intent.  Therefore, the plaintiffs' equal  protection claims cannot survive the defendants's summary judgment motion.

**B.      *Analysis***

The plaintiffs' claims against Spradlin and Burton are relatively straightforward in that the defendants are sought to be held liable for their own actions alleged to be constitutional violations. Thus, to survive summary judgment, the plaintiffs must have proffered sufficient evidence to create a genuine issue of material fact as to (1) whether Spradlin's and Burton's actions caused deprivations that were, objectively, sufficiently serious, and (2) whether Spradlin and Burton acted with deliberate indifference.

The claims against Landrum and Davidson, however, involve a layered analysis of supervisory liability.  Although the plaintiffs do not allege that Landrum and Davidson actually committed sexual abuse, the plaintiffs do argue that Landrum and Davidson "personally participated" in the constitutional violations.  Plaintiffs further argue that Landrum's policies, or lack thereof, caused the violations, that the history of widespread abuse put Landrum on notice of an excessive risk of harm, and that he unreasonably disregarded the risk.  (Pls.' Resp. to Landrum at 77.)  The court understands this argument to mean the plaintiffs bring two types of claims against Landrum and Davidson:  failure to protect from sexual abuse by guards and inmates in violation of the Eighth Amendment and failure to protect them from an excessive risk of harm that was created by policies Landrum and Davidson implemented or by policies Landrum and Davidson failed to implement in violation of the Eighth Amendment.

To survive summary judgment on the failure to protect claims, the plaintiffs must have proffered sufficient evidence to create a genuine issue of material fact as to (1) whether Landrum's

27

and Davidson's actions caused deprivations that were, objectively, sufficiently serious, and whether Landrum and Davidson acted with deliberate indifference, which involves the issues of (2) whether an excessive risk of serious harm existed at the time of the alleged deprivation, (3) whether Landrum and Davidson were aware of the excessive risk, and (4) whether Landrum and Davidson reacted to this risk in an unreasonable manner. *See Marsh*, 268 F.3d at 1028-29. All of the elements must be met, but the plaintiffs concentrate their argument on the obviousness of the risk.[15]  In opposition to the motions for summary judgment, the plaintiffs generally allege the "serious risk of female sexual assault," "the history of widespread abuse, which was reported on several occasions," and an "environment . . . permeated with sexual abuse by guards and male inmates against the female inmates." (Pls.' Resp. to Landrum at 70-71, 73.)  They also provide a chronology of events, which they allege constitute actual notice to Landrum of the risk of harm.[16]  (*Id*. at 58-60.)

To survive summary judgment on the claims against Landrum and Davidson for their deficient policies or practices, which led to an Eighth Amendment violation, the plaintiffs must have proffered sufficient evidence to create a genuine issue of material fact as to whether the plaintiff identified a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an excessive risk of the Eighth Amendment injury; (2) the supervisors were aware that the excessive risk was created; (3) the supervisors were indifferent to that risk; and (4) the injury resulted from the policy or practice. *See Beers-Capitol v. Whetzel*, 256

---

[15]  They assume without explanation the seriousness of the alleged deprivations and causation.  They conclude without significant analysis that the factual allegations taken as a whole constitute a "history of widespread abuse" and that Landrum "should have known" about all of it.  They ignore the requirement that Landrum must have known the risk to the plaintiffs before each plaintiff's injuries occurred.

[16]  Defendants dispute that these events constitute notice but acknowledge that the plaintiffs' case against Landrum is based on four discrete incidents.  (Landrum Br. at 99.)

F.3d 120, 134 (3d Cir. 2001).[17]  With respect to this claim, the plaintiffs allege offensive conditions

of confinement, which appear to include deficient jail policies.[18]  Unfortunately, the plaintiffs do not

take this argument much further; instead, their briefs are replete with assumptions and unsupported

conclusions.  They fail to evaluate how existing policies specifically created an excessive risk of

serious harm.

It is not incumbent on this court to develop or articulate arguments for the plaintiffs and to

sift through thousands of pages of evidence in order to prove up their claims.[19]  To the extent the

plaintiffs attempt to impose supervisory liability on Landrum and Davidson for deficient policies,

---

[17]  The Third Circuit's statement of the elements of the cause of action is entirely consistent with Eleventh Circuit jurisprudence, *see Rivas*, 940 F.2d at 1495, but is useful to the court and the litigants in evaluating claims against "supervisors."  On the face of the *Rivas* or the *Gonzalez* opinion, one would conclude that all that need be proved is an underlying constitutional violation by a subordinate and the existence of an improper policy.  This scheme ignores *Farmer*'s failure to protect inquiry, whereas the Third Circuit's analysis properly incorporates *Farmer*.

[18]  The plaintiffs state:

The conditions that should have alerted the Defendant Landrum to an objective risk of harm included: (1) deliberate indifference to the substantial risk of serious harm to the inmates of the jail; (2) deliberate indifference to the substantial risk of sexual abuse to the female inmates of the jail; (3) lack of an adequate policy to control inmate sexual abuse inside the jail, including inadequate training, a lack of policy regarding sexual abuse towards female prisoners, including how to report it, and how to reprimand guards, etc.; (4) failure to enforce a policy of segregating female and male inmates; male guards and female inmates; nonviolent inmates from violent inmates; pretrial detainees from convicted criminals; (5) failure to adequate staff, train, and supervise its employees, officers and agents, and a failure of such employees, officers and agents to supervise and control the sexual abuse inside the jail; (6) jail guards freely opened cell doors to allow inmates to roam freely; (7) the jail was not operated in accordance with written policies; (8) custodial responsibility assigned to incompetent and untrained inmates; (9) [t]rusty/inmates given free reign inside the jail; (10) previous assaults gave the defendants notice of the sexual abuse.

(Pls.' Resp. at 73-74.)  The court must decide whether the facts support a legal conclusion of deliberate indifference, so this list, which is infused with legal conclusions, is unhelpful.  But it does not constitute "conditions that should have alerted the Defendant Landrum to an objective risk of harm," as argued by the plaintiffs.  (*Id*. at 73.)

[19]  The law is clear that "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments."  *Resolution Trust Corp. v. Dunmar Corp*., 43 F.3d 587, 599 (11th Cir.1995); *see also Bowden ex rel. Bowden v. Wal-Mart Stores, Inc*., 124 F. Supp. 2d 1228, 1236 (M.D. Ala.2000) ("It is not for the court to manufacture arguments on Plaintiff's behalf.").

Landrum and Davidson (assuming *arguendo* that Davidson, as a sergeant, could even be considered a policymaker) are entitled to summary judgment. The plaintiffs have not identified a specific policy or practice that the supervisors failed to employ and have not shown that the existing policy or practice created an excessive risk of serious harm. *See City of Canton*, 489 U.S. at 389; *Rivas*, 940 F.2d at 1495; *Beers-Capitol*, 256 F.3d at 134. The plaintiffs' list of offensive conditions of confinement is insufficient.

The court will analyze the remaining claims on a plaintiff-by-plaintiff basis.

### 1.   Denise Bonner

Ms. Bonner's only remaining § 1983 claims are against Landrum and Davidson. She alleges that she was raped by an inmate who entered her cell in I-Block. From an objective view, the rape of an inmate by another inmate is a sufficiently serious deprivation to establish an Eighth Amendment violation by Landrum or Davidson. The ultimate issue here is whether the subjective prong has been met, i.e., whether the prison official who failed to protect against the inmate rape acted with deliberate indifference. The court must determine whether Ms. Bonner has proffered sufficient evidence to create a genuine issue of material fact as to (1) whether an excessive risk of serious harm existed at the time of Ms. Bonner's rape, (2) whether Landrum or Davidson were aware of the excessive risk, and (3) whether Landrum or Davidson reacted to this risk in an unreasonable manner. *See Marsh*, 268 F.3d at 1028-29.

Assuming the truth of all of the facts related to Ms. Bonner's claims, the court concludes that there is no Eighth Amendment violation. The only incident evidencing a risk of harm in December 2003 is Ms. Lovelace's May 2002 letter and complaint to Landrum. The letter included information about sexual activity and drug use in the jail and specifically fingered Gore among others. The letter

30

presented allegations of serious wrongdoing by guards, but the allegations – either alone or in conjunction with what could be deemed retaliatory attacks on Lovelace – do not constitute an excessive risk of inmate-on-inmate sexual abuse. After another inmate complaint against Gore, Landrum responded by terminating Gore approximately one month after Ms. Lovelace's letter. Without more, Ms. Bonner has not shown that Landrum was aware of sufficient acts from which he could infer the existence of a substantial risk of serious harm.[20] Therefore, Landrum and Davidson are entitled to summary judgment on Ms. Bonner's § 1983 claims.

### 2.    <u>Chasity Brewer</u>

Ms. Brewer's remaining § 1983 claim is brought solely against Landrum. She alleges that she was sexually assaulted by Officer Tucker in August 2004. To hold Landrum liable for Tucker's Eighth Amendment violation, Ms. Brewer must establish Landrum knew of and disregarded an excessive risk of harm of sexual abuse.[21] As with Ms. Bonner's claims, the ultimate issue here is whether Landrum acted with deliberate indifference, which involves consideration of the following: (1) whether an excessive risk of serious harm existed at the time of Ms. Brewer's sexual assault, (2) whether Landrum was aware of the excessive risk, and (3) whether Landrum reacted to this risk in an unreasonable manner. *See Marsh*, 268 F.3d at 1028-29.

Assuming the truth of all of the facts related to Ms. Brewer's claims, the court concludes that Landrum is entitled to summary judgment. There is insufficient evidence to establish the existence

---

[20] Davidson also was not aware of a substantial risk of serious harm after Gore's termination. It is doubtful that Davidson, as a sergeant, had the legal authority to react to Ms. Lovelace's letter beyond making the report to Landrum, her supervisor and the person in charge of the daily operation of the Jail.

[21] Ms. Brewer does not attempt to assert any other theory of supervisory liability on Landrum for Tucker's sexual assault, which in itself is an Eighth Amendment violation. *Boxer X*, 437 F.3d 1111.

of an excessive risk of harm of sexual abuse in August 2004.  As the court explained above, Ms. Lovelace's May 2002 allegations were insufficient to show an excessive risk of serious harm.  Ms. Bonner's rape in December 2003 adds little to the equation because her allegations are substantially different than the allegations about Gore.[22]  There are no other facts from which Landrum could infer the existence of an excessive risk of serious harm.  Ms. Brewer alleges that the sexual assaults by Tucker occurred in the laundry room, which is located across from Landrum's office.  She asserts that Landrum's secretary "could have easily seen who was going in and out of the laundry room." (Pls.' Resp. at 17.)   To the extent that Ms. Brewer argues that the possibility that Landrum's secretary observed the door to the laundry room imputes knowledge of specific risk of harm to Landrum, this argument must be rejected outright.  Accordingly, Landrum is entitled to summary judgment with respect to Ms. Brewer's Eighth Amendment claim.

    **3.**    **April Mann**

Ms. Mann's remaining § 1983 claim is brought solely against Landrum.  Ms. Mann alleges that while a group of unsupervised inmates awaited transport from court back to the Jail in August 2004, Chartina Porter, a male inmate, touched Ms. Mann with his hands and his body.  Landrum is entitled to summary judgment because there is no constitutional violation.  Even if this touching is "objectively, sufficiently serious," there is no evidence of an excessive risk of serious harm to inmates while at the courthouse and no evidence from which once could infer that Landrum had knowledge of and disregarded such risk.

---

[22]  The plaintiffs argue that Landrum acted unreasonably after Ms. Bonner reported the rape.  His actions in procuring Ms. Bonner's "release" do raise eyebrows, but they do not constitute an Eighth Amendment failure to protect claim, nor do they constitute evidence of notice to Landrum of the excessive risk of serious harm.

Ms. Mann also alleges that Burton propositioned her and her cellmates to engage in a "striptease" or "freak show."  Ms. Mann was not compelled to engage in a striptease for Burton; she was not forced, threatened, or otherwise coerced and, in fact, she did not engage in a striptease. Burton's mere proposition is neither a violation of Ms. Mann's right to bodily privacy, *cf. Boxer X*, 437 F.3d at 111, nor a violation of her right to be free from severe or repetitive sexual abuse by prison officials.  *See, e.g., Barney*, 143 F.3d 1at 1311 n.11 (noting that verbal harassment is not sufficient to state a claim under the Eighth Amendment).   Because Ms. Mann's allegations do not give rise to a constitutional violation, no liability can be placed on Landrum.  Landrum is entitled to summary judgment on Ms. Mann's § 1983 claims.

### 4.  <u>Jami Davis</u>

Ms. Davis's remaining § 1983 claims are against Spradlin, Burton, and Landrum.  Ms. Davis asserts that Spradlin and Burton violated her right to bodily privacy.  Unlike the plaintiffs in *Boxer X*, *Fortner*, and *Lee*, however, there is no evidence of Ms. Davis's compelled nudity or masturbation. Ms. Davis alleged that Spradlin touched her genitalia, kissed her, and generally groped her on several occasions and that Burton gave her drugs in exchange for oral sex.   Although demeaning and humiliating, Spradlin's touching and groping and even Burton's compulsion of Ms. Davis's performance of oral sex does not involve the exposure of Ms. Davis's genitalia.  Therefore, under existing precedent, Ms. Davis's allegations do not implicate the right to bodily privacy,[23] but rather

---

[23]   The court is not unaware of the peculiar result this foretells. Prisoners have a special sense of privacy in their genitals precluding the involuntary exposure to members of the opposite sex.  *Fortner*, 983 F.2d at 1030. However, if the mere groping of the genitals of a prisoner is neither a violation of the right to bodily privacy nor more than a *de minimis* injury (and, therefore, not actionable as a constitutional violation), *see infra* note 26, there is no civil relief for "ordinary" (as opposed to "severe and repetitive") sexual abuse in Alabama jails.  This is because Alabama and Eleventh Circuit precedent firmly establish that not only sheriffs but also jailers have state constitutional immunity to state law claims.  As the right to bodily privacy presently exists, in some cases jailers are effectively given a free pass to abuse prisoners so long as they "touch but don't look."

the right against inhumane conditions of confinement for subjecting her to sexual abuse. *See Boxer X*, 437 F.3d at 1111( holding that "severe or repetitive sexual abuse of a prisoner by a prison official can violate the Eighth Amendment"). Thus, Ms. Davis's claims against Spradlin and Burton on the basis of the right to bodily privacy must fail.

Ms. Davis also asserts that Spradlin and Burton violated her Eighth Amendment right to be free from sexual abuse while incarcerated. Ms. Davis's Eighth Amendment claims against Spradlin and Burton survive summary judgment. There is evidence from Ms. Davis that Spradlin touched her on her genitalia or made Ms. Davis touch his genitals over his clothing, kissed her, and groped her *on a daily basis* beginning in August of her four month incarceration. Other inmates witnessed the abuse on several occasions. Ms. Davis further testified that Burton suggested he bring her cocaine and candy in exchange for oral sex and that on two or three occasions she gave him oral sex when he came to her cell. Defendants argue that Ms. Davis voluntarily engaged in oral sex and sexual touching with Spradlin, Burton, and Yo-Yo Cooper in order to get what she wanted. According to the defendants, no Eighth Amendment violation can occur where sexual contact is voluntary. This argument, however, ignores the nonconsensual nature of prison life.[24] In Alabama an inmate cannot consent to sexual relations with a prison guard. *See* Ala. Code § 14-11-31 (1975) ("[T]he consent of the person in custody . . . shall not be a defense to a prosecution [for custodial sexual misconduct].")[25]

_____

[24] As Ms. Davis so aptly explained to defense counsel when she denied that her sexual contact with the guards was consensual: "You can't put junkie[s] in jail and offer them cocaine for sex and it be consensual." (Davis Dep. 122:7-16.)

[25] Additionally, Landrum admits that any sexual relations in the Jail is a violation of the Jail policy. (Landrum Dep. 83:6-11.)

Viewing the facts in a light most favorable to Ms. Davis, the court concludes that Spradlin and Burton sexually abused Ms. Davis. Being subjected to touching, kissing, and groping, as well as the oral sex, are deprivations that are, objectively, sufficiently serious.[26] The Second Circuit in *Boddie* held that the occasional touching of an inmate by a prison official does not constitute a constitutional injury. *Boddie*, 105 F.3d at 861-62 ("The isolated episodes of harassment and touching alleged by Boddie are despicable . . . . But they do not involve a harm of federal constitutional proportions as defined by the Supreme Court."). *Boddie* is distinguishable on its facts. Boddie alleged that a female correctional officer "squeezed his hand, touched his penis" on one occasion and, a couple of weeks later, bumped into his chest twice and pinned him to a door with her body. *Id.* at 859-60. Ms. Davis, on the other hand, endured months of daily, escalating abuse

---

[26] The court finds it necessary at this point to address the defendants' argument that some plaintiffs suffered only *de minimis* injuries and, thus, do not state an Eighth Amendment violation.

In recognizing that severe or repetitive sexual abuse of a prisoner by a prison official can violate the Eighth Amendment, the *Boxer X* Court held that "an injury can be 'objectively, sufficiently serious' [as required by *Farmer*] only if there is more than *de minimis* injury." *Boxer X*, 437 F.3d at 1111 (citing *Johnson v. Breeden*, 280 F.3d 1308, 1321 (11th Cir. 2002)). *Johnson* is cited for the *de minimis* injury proposition; however, *Johnson* is an excessive force case.

In Eighth Amendment **excessive force** cases like *Johnson*, a plaintiff must show that the defendants acted with a malicious and sadistic purpose to inflict harm and that more than *de minimis* injury resulted. *De minimis* injury is found where there was no physical injury or only minor discomfort. *See McReynolds v. Alabama Dept. of Youth Servs.*, No. 06-12542, 2006 WL 3147283, at *3 (11th Cir. Oct. 30, 2006) (collecting cases). In Eighth Amendment **conditions of confinement** cases – like *Boxer X* and the instant case, *see supra* note 13 – a plaintiff must show an objectively serious deprivation and that the prison official acted with deliberate indifference. It seems that a requirement of more than *de minimis* injury would be unsuitable as some conditions of confinement do not involve any physical injury at all. *See Marsh*, 268 F.3d at 1034 ("[A]n Eighth Amendment violation can arise from unsafe conditions of confinement even if no assault or similar physical injury has yet occurred."). Moreover, in those conditions of confinement cases that do involve some sort of physical injury, a more than *de minimis* injury requirement would be conceptually unnecessary as it would be subsumed by *Farmer*'s requirement of an "objectively, sufficiently serious" deprivation.

In denying the petition for rehearing en banc, the Eleventh Circuit emphasized the fact-specific nature of the holding in *Boxer X*. *Boxer X*, 459 F.3d at 1115 (Carnes, J., concurring). Adopting that reasoning, the instant case is distinguishable due to the actual sexual assaults on the inmates as well as the duration and seriousness of the abuse – facts not found to exist in *Boxer X*.

by Spradlin and less frequent but more severe abuse by Burton. The alleged conduct by both defendants is sufficiently serious harm.

Spradlin and Burton clearly acted with deliberate indifference. *Boddie*, 105 F.3d at 861 ("[A] prison official who sexually abuses a prisoner can be found to have a sufficiently culpable state of mind to violate the prisoner's constitutional rights."). Because no legitimate penological purpose can be inferred from the defendants' alleged conduct, the sexual abuse itself is sufficient evidence of a culpable state of mind. *Id.* (citing *Hudson*, 503 U.S. at 6-7). Therefore, to the extent Spradlin and Burton challenge Ms. Davis's Eighth Amendment claims against them, their motions for summary judgment are denied.

Ms. Davis also brings her § 1983 claims against Landrum. Landrum can be directly liable, if at all, for his own failure to protect Ms. Davis from Spradlin and Burton in violation of the Eighth Amendment. Plaintiffs argue only that because of "the history of widespread abuse, which was reported on numerous occasions," Landrum had "subjective knowledge of a serious risk of female sexual assault inside the jail, [and] he had objective knowledge, in that he should have known because the risk was obvious." (Pls.' Resp. to Landrum at 70-71.)

Landrum is not entitled to summary judgment on Ms. Davis's claims because the proffered evidence presents a genuine issue of material fact as to whether Landrum "must have known" about the risk of serious harm. *See Farmer*, 511 U.S. at 842 (stating that the issue of whether the defendant has sufficient knowledge is a question of fact). Ms. Davis need only present "evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, *or* expressly noted by prison officials in the past," and evidence of "circumstances [that] suggest that [Landrum] had been exposed to information concerning the risk and thus must have known about it." *Id.* at 842-

36

43 (emphasis added).  Ms. Davis has presented evidence from which a fact finder may infer that Landrum had actual knowledge of allegations of custodial sexual misconduct against Gore, which proved to be true, and Ms. Lovelace's subsequent, and perhaps retaliatory, sexual assault.  He also knew that Ms. Bonner was raped by an inmate or at least that guards or inmates were unlocking doors or jamming door locks in order for inmates to engage in impermissible sexual acts.  From Ms. Parker's September 2004 grievance, Landrum further knew that Burton was not acting to prevent or stop the sexual misconduct between Yo-Yo and Ms. Davis.[27]  This last allegation is significant. Ms. Parker's grievance is unlike the earlier instances where Landrum took some action in response to the allegations, and those actions evidence his reasonable belief that no risk of harm remained.

---

[27]  Neither Ms. Brewer nor Ms. Mann reported their incidents to Landrum or any other Jail official, so on the evidence presented, their allegations cannot go to show Landrum's knowledge.  Ms. Brewer testified that after Officer Danny Tucker coerced her to give him oral sex during her incarceration at the Jail sometime between June 2004 and September 2004, she did not report the incident:

> Q.  All right.  Did you ever complain or tell an officer or Major Landrum, anyone in administration about what was going on with Officer Tucker?
> A.  No, I didn't.
> Q.  Did you ever file any kind of grievance or write any written request form?
> A.  No.

(Brewer Dep. 133:23-134:16.)  Ms. Brewer further testified that she did not write to or call anybody outside of the Jail to report Officer Danny Tucker's actions.  (*Id*. 159:20-161:13.)  Ms. Mann testified that she did not report her sexual assault at the courthouse to any court or jail official:

> Q.  Did you ever try to get anybody's attention when they came out into the hallway?
> A.  No.
> Q.  Why was that?
> A.  I just didn't.
> Q.  Did you tell the officers when they came back what had happened?
> A.  No.
> Q.  Why didn't you tell them?
> A.  Well, I was being housed in this jail, and there was so much going on in that jail, I just didn't.  I figured it would cause me more problems.
> Q.  Did you ever tell anybody once you got back to the jail?
> A.  Yes.  I didn't tell any guards or anybody.  I told, you know, my roommates.

(Mann Dep. 50:12-51:8.)

A reasonable juror could find that Landrum took no action whatsoever in response to Ms. Parker's allegations.  The court does not surmise what the jury will do; the court finds only that there is evidence sufficient to raise the inference that, in September 2004, the state of Landrum's knowledge had ripened into the realm of "must have known."  Accordingly, Landrum is not entitled to summary judgment on Ms. Davis's claims.

### 5.   <u>Chandra Parker and Jean Brooks</u>

Ms. Parker and Ms. Brooks bring § 1983 claims against Burton, Davidson, and Landrum. At the summary judgment stage Burton does not challenge Ms. Parker's and Ms. Brooks's § 1983 claims against him for violations of their rights under the Eighth and Fourteenth Amendment rights. Other than the equal protection claim discussed above, these claims remain.

With respect to the claims against Davidson, the plaintiffs attempt to show that there is a genuine issue for trial by arguing Landrum's supervisory liability extends to Davidson: "Because Lisa Davidson is a supervisor in charge of the Plaintiffs she was sufficiently liable to Plaintiffs Bonner, Parker, and Brooks for supervisory liability because of her personal involvement and inaction in the same manner as Defendant Bill Landrum is."  (Pls." Resp. to Davidson, at 10.) Assuming without deciding that a sergeant can be held liable as a supervisor under the facts of this case, this extension argument is wholly insufficient to overcome summary judgment.  For the reasons stated in Memorandum Brief in Support of Defendant Lisa Davidson's Motion for Summary Judgment (Doc. # 124),  Davidson is entitled to summary judgment on Ms. Parker's and Ms. Brook's claims.

The claims against Landrum for his failure to protect Ms. Brooks from the January 11, 2005 compelled masturbation and nudity by Burton and his direct failure to protect Ms. Parker and Ms.

Brooks from the January 25, 2005 sexual assault by Burton survive summary judgment.  Burton's sexual assaults and compelled masturbation and nudity on the plaintiffs are deprivations that are, objectively, sufficiently serious, and the plaintiffs have proffered sufficient evidence to create a genuine issue of material fact as to Landrum's deliberate indifference.  At the time of Ms. Brooks's and Ms. Parker's deprivations, Landrum had been exposed to enough information concerning the risk of harm to the female inmates in the Jail by other inmates and by the guards, particularly Burton, that a trier of fact could find that Landrum had knowledge of the substantial risk of harm to female inmates.  In addition to receiving notice from his meeting with Ms. Parker in September 2004, in which they discussed Burton's improper behavior with respect to Yo-Yo Cooper and Ms. Davis, Landrum also received notice of the entirety of the allegations in this case upon the filing of the lawsuit.  The lawsuit was filed on December 22, 2004, and court records (Doc. # 5) show that Landrum was served process no later than January 7, 2005.[28]

Ms. Parker testified that Landrum promised to investigate her allegations and get back to her but that she did not hear back from him, and, therefore, Landrum must not have conducted an investigation:

> Q:    Do you know whether or not an investigation was done?
> A:    If it has, he didn't make me aware.
> Q:    But it could have been done and you wouldn't have known about it?
> A:    I mean, he told me he would get back with me, so I assume an investigation wasn't done.

(Parker Dep. 110:19-111:5.)  The evidence further shows that Landrum took little or no action in response to the allegations in the lawsuit.  Landrum did not speak with Davidson, (Davidson Dep.

---

[28]  Landrum testified that he first received a copy of the original complaint in December 2004 from the plaintiffs' counsel.  (Landrum Dep. 34:5-34:6.)

29:4-31:4), or Burton (Burton Dep. 60:10-62:17), nor did he conduct any sort of staff meeting about the allegations during the immediate months following the filing of the lawsuit. (*Id*. at 62:18-21). One may conclude from this evidence that Landrum must have known about the risk, but this is not a mandatory inference; at trial Landrum will have the opportunity to show he was unaware of the risk. *See Farmer*, 511 U.S. at 844.

Taking the plaintiffs' allegations and all reasonable inferences as true, the court concludes that the plaintiffs have proffered sufficient evidence to create a genuine issue of material fact as to whether Landrum disregarded or responded reasonably to the risk of harm. Thus, with respect to the Ms. Parker's and Ms. Brooks' claims, Landrum's motion for summary judgment must be denied.

**C.    *Qualified Immunity***

Landrum argues that he is entitled to qualified immunity.[29]

**1.    Qualified Immunity Standard**

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To be even potentially eligible for qualified immunity, the official has the burden of establishing that he was acting 'within the scope of his discretionary authority.'" *O'Rourke v. Hayes*, 378 F.3d 1201, 1205 (11th Cir. 2004) (quoting *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995)). Defendants must show, for each act in question, that they were performing a legitimate job-related function through means that were

---

[29]  Davidson also asserted the defense of qualified immunity.  Because the court has determined that she is entitled to summary judgment on all of the claims against her, the court need not analyze the defense with respect to Davidson.

within their power to utilize.  *Id.*  "If the defendants were not acting within their discretionary authority, they are ineligible for the benefit of qualified immunity."  *Lumley v. City of Dade City*, 327 F.3d 1186, 1194 (11th Cir. 2003);  *see Barker v. Norman*, 651 F.2d 1107, 1121 n.18 (5th Cir. 1981)[30] (noting that "an official's actions may be so far removed from the ordinary course of his duties, so outside even his discretionary authority to act, that the official cannot establish his entitlement to claim immunity in the first instance").  This is because an official who acts outside of his or her discretionary authority "ceases to act as a government official and instead acts on his own behalf;" therefore, "the policies underlying the doctrine of qualified immunity no longer support its application."  *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998).

Once it is established that the defendant was acting within his discretionary authority, the burden shifts to the plaintiff to prove that qualified immunity is not warranted.  *Vinyard*, 311 F.3d at 1346.  The Supreme Court has articulated a two-part test in the qualified immunity analysis.  First, the court must determine whether the plaintiff's allegations establish a constitutional violation.  *Hope v. Pelzer*, 536 U.S. 730, 736 (2002); *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (stating that the court must evaluate the complaint to determine if, assuming the allegations are true, it pleads a cognizable violation of the constitution).  If this is answered in the affirmative, the court's next step is to determine whether the right in question was clearly established.  *Saucier*, 533 U.S. at 201.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted."  *Id.* at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (stating that "the right allegedly violated

---

[30]  The Eleventh Circuit has adopted all prior decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, as binding precedent.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

must be defined at the appropriate level of specificity before a court can determine if it was clearly established.")).  In essence, a defendant is entitled to "fair warning" that his alleged conduct would be unconstitutional.  *Hope*, 536 U.S. at 741.  A plaintiff can establish that the law clearly provided notice to the officers that the conduct was unconstitutional by submitting fact-specific precedents or demonstrating that the conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent."  *See Vinyard*, 311 F.3d at 1355 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002)).

## 2.    Qualified Immunity Analysis

The court now will analyze the application of Landrum's qualified immunity defense to the plaintiffs' remaining claims against him.

### a.  Discretionary Authority

The court addressed Landrum's qualified immunity argument at the motion to dismiss stage. Invoking *Barker*, the court rejected the qualified immunity defense because Landrum did not carry his burden of establishing he was acting within the scope of his discretionary authority.  He failed to show that, on the facts alleged in the Second Amended Complaint, he was performing legitimate job-related functions through means that were within his power to utilize.

Landrum again attempts to pass what has been called the "low hurdle" of establishing discretionary authority.[31]  In support of his argument that he was acting within his discretionary authority, Landrum submitted his Declaration:

> All actions, decisions, and judgments which relate to any and all of the Plaintiffs and any and all of their allegations took place completely within the context of my duties

---

[31]  The court reminds Landrum that the discretionary authority prong of the qualified immunity defense is not met as a matter of course, is supported by Supreme Court jurisprudence, and is the defendant's burden to carry.

as Jail Administrator for the Chambers County Jail. But for my employment at the Chambers County Jail, I would have had no contact or interaction whatsoever with the Plaintiffs.

Decisions, judgments and actions taken with respect to inmate supervision, staffing, investigation of claims or complaints made by inmates, policy training, formulation of policy, implementation of policy, are all part of the discretionary duties of the Chambers County Jail Administrator.

(Landrum Decl. ¶¶ 17-18.)  However, "[a] bald assertion that the acts were taken pursuant to the performance of duties and within the scope of duties will not suffice" to meet the defendant's burden of proof.  *Harbert Int'l*, 157 F.3d at 1282.

Landrum claims that this is undisputed testimony, yet the plaintiffs contend that Landrum was not acting within his discretionary authority in every complained of circumstance.  According to the plaintiffs, these circumstances specifically include Landrum allowing inmate Tony Brewer to have sex with Plaintiff Chassity Brewer, disregarding Lovelace's and Parker's complaints of sexual abuse, confiscating Lovelace's letters to her attorney, kicking the plaintiffs' investigator out of the jail, drafting a release of liability for Bonner to sign, and failing to discipline Spradlin and Burton after their acts of sexual misconduct. (Pls.' Resp. at 63-64.)  Landrum counters that "the general nature of the defendant's action[s]" falls within the inherent nature of a jail administrator. *Holloman*, 370 F.3d at 1266.

The court finds that Landrum has carried his burden of showing that he was acting within his discretionary authority with respect to the remaining claims.  The general nature of Landrum's actions, such as investigating complaints and disciplining jailers, is part of the job as jail administrator.  The other specific acts that the plaintiffs contend do not fall within Landrum's discretionary authority are not the basis of the remaining § 1983 claims against Landrum.  For

43

example, allowing inmate Tony Brewer to have sex with Plaintiff Chasity Brewer during a time when Chasity Brewer was not an inmate is not an act that forms the basis of a constitutional violation.  This is not to say, however, that evidence of Landrum's actions cannot be used to circumstantially demonstrate his knowledge or to support his liability on the plaintiffs' other claims.

### b.  Constitutional Violation of a Clearly Established Right

The court has already determined that the plaintiffs' evidence is sufficient to establish Landrum's violation of Ms. Davis's, Ms. Parker's, and Ms. Brooks's constitutional rights.  Under the framework for qualified immunity analysis, the next issue to be decided is whether Ms. Davis's, Ms. Parker's, and Ms. Brooks's rights were clearly established at the time of the deprivation. Landrum argues that "[n]o clearly established law would have provided fair warning to Landrum that his policies or conduct violated the Plaintiffs' constitutional rights under the circumstances alleged in the Complaint." (Landrum Br. at 117.)  The plaintiffs argue this is an "obvious clarity" case. Giving short shrift to this analysis, Landrum reasons that "[obvious clarity] is rarely the case, [and] the court will normally require case law arising out of a factually similar context before it concludes the public official had sufficient notice or fair warning."  (*Id*. at 95-96.)

Landrum's statement of the law is erroneous.  In *Hope v. Pelzer*, the Supreme Court squarely rejected the "materially similar facts" test developed by the Eleventh Circuit to determine whether a right is clearly established.  Relying on its earlier decision in *Lanier*,[32] the Court restated the

---

[32]  The Supreme Court in *Lanier* also held:

[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful.

*Lanie*r, 520 U.S. at 271 (citation and internal quotation marks and brackets omitted).

standard for determining whether a right is clearly established:

> Our opinion in *Lanier* thus makes clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in Lanier, we expressly rejected a requirement that previous cases be "fundamentally similar." . . . Accordingly, pursuant to *Lanier*, the salient question that the Court of Appeals ought to have asked is whether the state of the law [at the time of the deprivation] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional.

*Hope*, 536 U.S. at 741.[33]

Applying this standard, the court finds that there is no question that the right not to be sexually abused and the right to bodily privacy while incarcerated was clearly established at all times relevant to this suit. *See Farmer*, 511 U.S. at 833-34; *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976); *Fortner*, 983 F.2d at 1030. Landrum had "fair warning" that his deliberate indifference to sexual and privacy abuse was constitutionally prohibited. *See Farmer*, 511 U.S. at 833-34; *Fortner*, 983 F.2d at 1030. *Farmer* may have involved sexual abuse by inmates, but the rule in *Farmer* logically extends to cases involving sexual abuse by jail guards. *See Holloman*, 370 F.3d at 1277 (concluding that, to provide fair warning, a case need not be on all fours). Accordingly, Landrum is not entitled to qualified immunity.[34]

## D.    *Injunctive and Declaratory Relief*

The plaintiffs originally sought injunctive and declaratory relief; however, the plaintiffs are

---

[33] This is not say that earlier cases do not provide support for a conclusion that the law is clearly established. *Hope*, 536 U.S. at 741.

[34] Having already determined that there is a genuine issue of material fact as to whether Landrum was deliberately indifferent, the court cannot conceive of how a reasonable Jail Administrator would believe he was acting in accord with clearly established law while also believing that there is an excessive risk to the inmates and failing to respond to that risk. Deliberate indifference cannot be reasonable conduct. *See Hill v. Dekalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1186 (11th Cir. 1994), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730 (1994); *but see Marsh*, 268 F.3d at 1031 n.8.

no longer incarcerated at the Jail and Landrum is retired.  As such, the plaintiffs cannot establish standing to bring such claims.  *See City of Los Angeles v. Lyons*, 461 U.S. 95 (1983); *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1554 (11th Cir. 1989).  Therefore, the claims for injunctive and declaratory relief must be dismissed.

**E.      *Motion to Strike Deposition Testimony and Reports of Plaintiffs' Expert Witness***

The defendants moved to strike the deposition testimony and reports of the plaintiffs' expert witness, Dr. Alvin W. Cohn.  Because the court does not rely on any part of Dr. Cohn's testimony or reports for the resolution of these motions, the motion will be denied as moot.  The court will reserve ruling on the motion to the extent the defendants seek to exclude his testimony at trial.

**F.      *Motion to Strike Answer and/or Affirmative Defenses***

The plaintiffs moved to strike the answer and/or affirmative defenses of Landrum and Davidson.  Because the court cannot conclude that the defendants waived the defenses presented in their answer, the court will deny this motion.

<u>**SECTION 1985 AND 1986 CLAIMS**</u>

**A.      *Section 1985***

The defendants argue that the plaintiffs' § 1985(3) claim for conspiracy to violate their constitutional rights must fail on the merits.[35]  To establish a § 1985(3) claim, a plaintiff must show "(1) a conspiracy; (2) for the purpose of depriving . . . any person or class of persons of the equal protection of the laws . . .; and (3) an act in furtherance of the conspiracy; (4) whereby a person is

---

[35]  Landrum and Davidson also argue they are entitled to qualified immunity on the claim.  However, the defense of qualified immunity is unavailable to public officials in § 1985(3) actions.  *Burrell v. Bd. of Trustees of Ga. Military Coll.*, 970 F.2d 785, 793-94 (11th Cir. 1992).  Other circuits may allow public official defendants to assert qualified immunity, but the court in the instant action must follow precedent.

either injured . . . or deprived of any [constitutional] right." *Burrell v. Bd. of Trustees of Ga. Military Coll.*, 970 F.2d 785, 793-94 (11th Cir. 1992) (internal quotation marks and citation omitted). "The second element requires a showing of some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.* at 794 (internal quotation marks and citation omitted). The plaintiffs cannot overcome this "significant hurdle." *Id.* As discussed in the equal protection analysis above, the plaintiffs have not provided sufficient evidence to establish that the defendants acted with unlawful discriminatory intent, and, therefore, the defendants are entitled to summary judgment on the § 1985(3) claims. *See, e.g., Valanzuela v. Snider*, 889 F. Supp. 1409, 1420 (D. Colo. 1995).

**B.     Section 1986**

The defendants are also entitled to summary judgment on the plaintiffs' § 1986 claims. Section 1986 claims are derivative of § 1985 violations. *Parker v. City of Atlanta*, 120 F.3d 1157, 1159-60 (11th Cir. 1997). Because the plaintiffs have produced no evidence of a § 1985 conspiracy (involving the defendants or other unnamed conspirators), it necessarily follows that the defendants cannot be liable for a failure to prevent a conspiracy that did not exist.

## STATE LAW CLAIMS

Ms. Parker and Ms. Brooks bring state law claims of privacy, outrage, and assault and battery against Burton. Ms. Davis brings those same state law claims against Spradlin and Burton. Spradlin and Burton challenge these claims as a matter of law. Although they do not specifically assert sovereign immunity under § 14 of Article I of the Alabama Constitution, such immunity applies in

this instance.[36]  Because jailers are afforded the same state constitutional immunity as sheriffs under Alabama law, the state law claims for money damages against Spradlin and Burton must be dismissed.  *See Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1429-31 (11th Cir. 1998).

## V.  CONCLUSION

Accordingly, it is ORDERED that

1.      Plaintiff Melanie Lovelace's claims are DISMISSED with prejudice;

2.      The Motion for Summary Judgment (Doc. # 108) filed by Defendant Tommy Spradlin is GRANTED in part and DENIED in part;

      a.      It is GRANTED with respect to the claims of

           (1)      equal protection,

           (2)      substantive due process,

           (3)      injunctive and declaratory relief,

           (4)      state law claims, and

           (5)      Plaintiff Jami Davis's § 1983 claim for a violation of right to bodily privacy;

      b.      The above-mentioned claims (2.a.(1)-(5)) are DISMISSED with prejudice;

      c.      It is DENIED with respect to Plaintiff Jami Davis's § 1983 claim for a violation of her Eighth Amendment right; and

      d.      Plaintiff Jami Davis's § 1983 claim for a violation of her Eighth Amendment right remains.

---

[36]  The sovereign immunity protection afforded by the Alabama Constitution is akin to a jurisdictional matter such that it is non-waivable and can be raised *sua sponte* by the court.  *See Boaz Nursing Home v. Recovery Inns of Am.*, 266 So.2d 588, 591-92 (1972).

3.      The Motion for Summary Judgment (Doc. # 111) filed by Defendant Derrick Burton is GRANTED in part and DENIED in part;

      a.      It IS GRANTED with respect to the claims of

            (1)      equal protection,

            (2)      substantive due process,

            (3)      injunctive and declaratory relief,

            (4)      state law claims,

            (5)      claims under § 1985 and § 1986, and

            (6)      Plaintiff Jami Davis's § 1983 claim for a violation of right to bodily privacy;

      b.      The above-mentioned claims (3.a.(1)-(6)) are DISMISSED with prejudice;

      c.      It is DENIED with respect to Plaintiff Jami Davis's § 1983 claim for a violation of her Eighth Amendment right; and

      d.      Plaintiff Jami Davis's § 1983 claim for a violation of her Eighth Amendment right, as well as the § 1983 claims of Plaintiff Chandra Parker and Plaintiff Jean Brooks, remain;

4.      The Motion for Summary Judgment (Doc. # 118) filed by Defendant Annie Alisha Davidson is GRANTED;

      a.      Judgment is entered in favor of Defendant Annie Alisha Davidson; and

      b.      Annie Alisha Davidson is DISMISSED as a defendant to this action;

5.      The Motion for Summary Judgment (Doc. # 117) filed by Defendant Bill Landrum is GRANTED in part and DENIED in part;

      a.      It is GRANTED with respect to the claims of

           (1)     equal protection,

           (2)     substantive due process,

           (3)     injunctive and declaratory relief,

           (4)     claims under § 1985 and § 1986,

           (6)     all § 1983 claims of Plaintiff Denise Bonner, Plaintiff Chasity Brewer, and Plaintiff April Mann;

      b.      The above-mentioned claims (5.a.(1)-(6)) are DISMISSED with prejudice;

      c.      It is DENIED with respect to the § 1983 claims of Plaintiff Jami Davis, Plaintiff Chandra Parker, and Plaintiff Jean Brooks; and

      d.      The § 1983 claims of Plaintiff Jami Davis, Plaintiff Chandra Parker, and Plaintiff Jean Brooks remain;

6.     The Motion to Strike Deposition Testimony and Reports of the Plaintiffs' Expert Witness (Doc. # 151) is DENIED as MOOT in part, and the court RESERVES ruling in part.

7.     The Motion to Strike Answer and/or Affirmative Defenses (Doc. # 180) is DENIED.

DONE this 26th day of July, 2007.

                    /s/   W.  Keith Watkins
                    UNITED STATES DISTRICT JUDGE